IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARSHA M. ROBERSON, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-0240-BH |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the District Court's *Order of Transfer*, dated April 6, 2010, this case has been transferred for all further proceedings and entry of judgment in accordance with 28 U.S.C. § 636(c). Before the Court are *Plaintiff's Motion for Summary Judgment*, filed May 10, 2010, and *Defendant's Motion for Summary Judgment*, filed July 1, 2010. Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED**, Defendants's motion is **DENIED**, and the case is **REMANDED** to the Commissioner.

### I. BACKGROUND[2]

**A.     Procedural History**

Plaintiff Marsha M. Roberson ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Titles II and XVI of the Social Security Act. On October 9, 2007, Plaintiff filed applications for disability insurance benefits and supplemental security income, alleging disability since May 19,

---

[2] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

2005, due to thyroid problems, spinal pain, dysesthesia of the bilateral upper and lower extremities with pain to the cervical and thoracic area. (Tr. at 197, 203, 274.) Her application was denied initially and upon reconsideration. (Tr. at 99, 111.) She timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 117-18.) She personally appeared and testified at two hearings held on December 15, 2008, and June 4, 2009. (Tr. at 20-21, 63-64.) On July 9, 2009, the ALJ issued a decision finding Plaintiff not disabled. (Tr. at 11-19.) On October 30, 2009, the Appeals Council denied her request for review, and the ALJ's decision became the final decision of the Commissioner. (Tr. at 1-3.) On February 5, 2010, Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.    Factual History**

    **1.    Age, Education, and Work Experience**

Plaintiff was born on October 26, 1967, was 37 years old at the time of her alleged onset date, and was 41 years old at the time of the second hearing before the ALJ. (Tr. at 197.) She has an 11th grade education and no vocational training. (Tr. at 24, 147.) Her past relevant work includes jobs as a home attendant, cashier, day worker, waitress, and merchant patroller. (Tr. at 17.)

    **2.    Medical Evidence**

On April 11, 2005, about a month before her alleged onset date, Plaintiff had a car accident. (Tr. at 27-28.) She visited the emergency room at Parkland Hospital on May 2, 2005, with complaints of diffuse neck and back pain that had started two to three days earlier. (Tr. at 332.) Based on x-ray studies, Jason Scott Stephens, M.D., noted that there was no clear acute osseous abnormality of the cervical spine, thoracic spine, or lumbosacral spine, and that the upper thoracic spine was "not well visualized due to overlying bony structures." (*Id.*) He also noted straightening

of the normal cervical lordosis and mild dextroscoliosis of the upper lumbar spine. (Tr. at 333.) Her diagnoses were cervical strain, thoracic strain, lumbar strain, and muscle spasm. (Tr. at 335.)

On May 18, 2005, Plaintiff visited the emergency room at Mesquite Community Hospital complaining of shoulder injury and pain and neck pain. (Tr. at 630-31.) X-ray studies of her right shoulder revealed that the soft tissue was unremarkable, the osseous structures were intact without evidence of fracture or dislocation, and there were no focal bony abnormalities or significant degenerative changes. (Tr. at 630.) There were no radiographic abnormalities. (*Id.*) X-rays of the cervical spine showed normal alignment without fracture or subluxation with well-maintained vertebral heights and disc spaces. (Tr. at 631.) There were no radiographic abnormalities of the cervical spine, but Plaintiff was noted to have acute myofascial cervical strain. (Tr. at 626, 631.)

On May 31, 2005, Plaintiff underwent an enhanced cervical spine MRI. (Tr. at 508.) She had decreased cervical lordosis, normal vertebral body height and marrow signal pattern, normal cervical spine cord, no significant reactive endplate changes, and no cerebellar tonsillar ectopia. (*Id.*) She had decreased signal intensity and some loss of height at C5-6, and decreased signal intensity without significant loss of height at C2-3, C3-4 and C4-5. (*Id.*) On July 29, 2005, based on the MRI report and the x-ray studies, Kathy Toler, M.D., opined that Plaintiff was an appropriate candidate for cervical epidural steroid injections but was not a surgical candidate. (Tr. at 510-511.)

On September 1, 2005, Plaintiff visited Robert Chouteau, M.D., with complaints of cervical, thoracic, and lumbar spine pain, with intermittent pain and dysesthesia of the bilateral upper and lower extremities. (Tr. at 523-25.) Upon examination, Dr. Chouteau noted that Plaintiff had severe pain and spasms in the bilateral cervical paraspinal musculature and trapezial area with limitation in range of motion, point tenderness upon palpation of the thoracic paraspinal musculature, limitations on full flexion and extension of the thoracic spine, approximately one centimeter

elevation of the of the right iliac crest of the lumbar spine, and rotation of the right PSIS on forward flexion of the lumbar spine. (Tr. at 524.) He also noted that Plaintiff had a normal thoracic spine. (*Id.*) His overall impression was that Plaintiff had traumatic cervical, thoracic, and lumbar myositis/strain, bilateral SI joint dysfunction, a two millimeter disc bulge at C3-4, and a three millimeter disc bulge at C4-C5 and C5-C6. (Tr. at 525.) He recommended cervical epidural steroid injections to the cervical spine and continued therapy and treatment. (*Id.*)

On September 29, 2005, Bradley Eames, D.O., diagnosed Plaintiff with cervical disc disease with radiculitis and post surgical hypothyroidism. (Tr. at 518-19.) Upon examination of the cervical spine, he noted a decreased range of motion in flexion, extension, side bending, and rotation, and an especially significant decrease in rotation bilaterally. (Tr. at 519.) He also noted that the muscles of her cervical spine and right trapezius were extremely tender, and her grip strength was grossly stronger in her left hand compared to the right. (*Id.*) He suggested cervical epidural steroid injections. (*Id.*) Plaintiff received the injections in the following two months. (Tr. at 512, 517.)

On October 27, 2005, Plaintiff saw Dr. Chouteau with complaints of cervical, thoracic and lumbar spine pain with intermittent dysesthesia of the bilateral upper extremities as well as nocturnal dysesthesia, but denied any bilateral leg pain. (Tr. at 514.) Dr. Chouteau noted that Plaintiff had "good relief" from the steroid injections to the cervical spine, and that full flexion and extension of her cervical and thoracic spine were limited. (Tr. at 515.) He diagnosed her with traumatic cervical, thoracic, and lumbar myositis/strain, bilateral SI joint lumbar dysfunction, two millimeter disc bulge at C2-C3 with three millimeter bulge at C3-C4, C4-C5, and C5-C6, and interspinous ligament tear at T8, T9, T10, and T11. (*Id.*)

On February 8, 2006, Plaintiff saw Ronald G. Washington, M.D., with complaints of frequent localized sharp, burning, and aching knee pain on a scale of eight out of ten, occasional

numbness and tingling in feet, and weakness in left leg and knee. (Tr. at 401-403.) Dr. Washington found no visible knee deformity, normal extension, and flexion limited to 130 degree. (Tr. at 402.) A knee joint stability test revealed a stable cruciate ligament and posterior medial menicus, but indicated menicus damage. (*Id.*) Dr. Washington prescribed Vicodin for pain, Valium for tension, and Soma for neuromuscular inhibition. (Tr. at 400.) His findings and his prescribed medication regimen remained unchanged through May 27, 2008. (*See* Tr. at 431-432.)

On November 20, 2007, Plaintiff underwent an internal medicine examination by Wendell Jones, M.D., for complaints of thyroid problems, and right upper extremity pain. (Tr. at 362.) She reported experiencing pain in her right arm virtually every day, all day long, and flare ups of her pain with swelling and stiffness. (*Id.*) Dr. Jones noted a decreased range of motion in her neck with mild tenderness on the right side. (Tr. at 363.) He also noted a decreased range of motion in her back but no tenderness. (*Id.*) Her musculoskeletal exam was significant for decreased motor strength in her right upper extremity, but her gait, station, and toe, heel, and tandem walking were fine, and her dexterous finger control was in tact. (*Id.*) Dr. Jones' clinical impression was that she had upper extremity pain with some relief from medication, thyroidectomy, and anxiety. (*Id.*)

On November 26, 2007, Lucy Dossett, M.D., noted that a limited AP view of the thoracic spine demonstrated a mild S-shaped scoliosis convexed right in the lower thoracic spine, but there was no definite subluxation, fracture, or other abnormality seen. (Tr. at 366.) She noted that there were metallic artifacts overlying the lower thoracic spine. (*Id.*)

On December 7, 2007, Plaintiff was seen at Parkland hospital for complaints of hypothyroidism and neck pain. (Tr. at 487.) She was diagnosed with hypothyroidism, chronic neck pain and marijuana abuse. (*Id.*) It was noted, however, that Plaintiff seemed to be exaggerating her symptoms and that her neck exam revealed a questionable range of motion. (*Id.*)

On December 13, 2007, Kelvin Samaratunga, M.D., completed Plaintiff's physical Residual Functional Assessment ("RFC"). (Tr. at 369-76.) He determined that Plaintiff could occasionally lift or carry ten pounds, frequently lift or carry ten pounds, stand or walk for about six hours in an eight-hour workday, sit for about six hours in an eight hour work day, push or pull without any restrictions, frequently kneel and crawl, occasionally climb ramps and stairs, occasionally balance, stoop and crouch, and never climb ladders, ropes or scaffolds. (Tr. at 370-71.) He determined that Plaintiff could handle, feel, and finger, but could not reach in all directions. (Tr. at 372.)

On May 1, 2009, Plaintiff reported acute right shoulder pain after suddenly lifting a heavy basket. (Tr. at 664.) X-rays conducted of her right shoulder at Parkland hospital were normal. (*Id.*)

### 3. Hearing Testimony

#### a. First Hearing

Plaintiff was represented by an attorney and testified at a hearing before the ALJ on December 15, 2008. (Tr. at 63-64, 67.) Plaintiff testified that she was single and lived with her twenty-year old son. (Tr. at 69.) She drove maybe twice a week. (*Id.*) Between 1996 and 1997, she was working as a security guard when a lady ran through the barricade and injured Plaintiff's right knee causing her to be off work for about three months. (Tr. at 70.) She became disabled in May of 2005 after her car was side-swiped by another car; she was taken to the hospital and diagnosed with muscle spasm in her neck and right shoulder. (Tr. at 71-73.)

She testified that her major problems from that accident were her neck, her right shoulder, and her arm. (Tr. at 71-72, 81.) She also had problems with her hand. (Tr. at 81.) She had constant sharp pain in her neck on a scale of eight out of ten, and it got worse when she moved her right arm or neck. (Tr. at 84.) Her shoulder pain was a ten on a scale of ten that day, and was a sharp, aching, and burning pain that got worse when she tried to move her right arm. (Tr. at 84-85.) The pain in

her right arm was seven on a scale of ten the last couple of days, and was a burning and stinging pain that got worse when she constantly used her right arm. (Tr. at 85-86.) Medication relieved her pain from time to time. (Tr. at 86.)

### b. Second Hearing

On June 4, 2009, Plaintiff, a medical expert ("ME"), and a vocational expert ("VE") testified at a supplemental hearing. (Tr. at 20-21.)

#### i. Plaintiff's Testimony

Plaintiff testified that she had neck, right shoulder, and back problems after her accident in April 2005. (Tr. at 28, 35.) She first experienced neck pain between 1992 and 1993 when she had neck surgery, but it became seriously bothersome after her accident. (Tr. at 36.) She started seeing a chiropractor and received therapy and shots. (Tr. at 37.) The pain was constant and achy, an eight on a scale of ten, and became worse when she turned her neck. (Tr. at 38-39.) Her medications relieved the pain and did not cause any side effects; a massage, a Lortab, and a heating pad also helped. (Tr. at 39.) The pain in her lower back started in 2005, and was a burning and stinging pain that came and went, and was felt all the way across her lower back. (Tr. at 42-43.) She had not received an opinion from her doctor as to what caused the pain. (Tr. at 43.)

She started having serious problems with her right shoulder in 2005 shortly after the accident. (Tr. at 40.) The pain in her shoulder was a burning pain that came and went. (Tr. at 42.) She went to a chiropractor for massage and therapy and had been seeing a doctor for her shoulder and neck pain at Parkland every two months for over a year, but the doctor only prescribed her medication and had not diagnosed her with anything. (Tr. at 40-41.) Her shoulder felt better when she relaxed and wrapped it in a warm towel. (Tr. at 42.)

With respect to her daily activities, Plaintiff testified that she got up at 7:30 in the morning

and went to bed at 9:30. (Tr. at 43.) She typically slept five hours a night and sometimes took pain medication to help her sleep. (Tr. at 43-44.) She washed, cooked, cleaned, and did housework during the day, and took her son different places. (Tr. at 44-45.) She had problems doing housework from time to time. (Tr. at 44.) Besides doing housework, she spent her days visiting family every other week. (Tr. at 44-45.) She read books and magazines for two hours and watched television for about four hours. (Tr. at 45.) She did not have any hobbies. (*Id.*)

As to her functional limitations, Plaintiff testified that she could reach up and straight out with her left arm but could not do so with her right arm without feeling pain. (Tr. at 45-46.) She could stand unsupported for about an hour and walk one block before needing rest. (Tr. at 47.) She could sit for about thirty minutes before needing to get up and move around. (*Id.*) She could bend over and stoop down to pick a piece of paper. (*Id.*) She could use both her hands to comfortably lift fifteen pounds, turn a door knob, hold a pencil, write, button her clothes, and pick up a coin. (Tr. at 46-48.) If she repetitively used her right hand for over ten or fifteen minutes, it started shaking and vibrating and caused a lot of pain from her fingers all the way up to her shoulder. (Tr. at 48.) The main reason she could not work was her pain. (*Id.*)

ii. Medical Expert's Testimony

The ME testified that Plaintiff's x-ray of the lumbar spine showed bilateral facet arthritis at L-5 and S-1 but no other abnormalities, and that there was no prominent complaint in the record about her lower back pain. (Tr. at 51.) Regarding Plaintiff's knee problems, the ME testified that some cartilage damage was seen in a 1998 MRI of her knee, and Dr. Washington's reports since 2005 described some knee tenderness, some crepitates and limited flexion of 130 degree, but her joint was stable. (Tr. at 51-52.) No leg or knee abnormalities were noted in a November 2007 exam, and her extremities were described as normal on April 30, 2009. (Tr. at 52.) Dr. Washington

consistently prescribed Vicodin, Valium, and Soma for her knee problems. (Tr. at 51-52.)

The ME stated that Plaintiff's chief complaint outside Dr. Washington's office was neck pain. (Tr. at 52.) She received a month of physiotherapy after her accident in April 2005, and saw a chiropractor for five months. (*Id.*) On May 2005, she had a tender neck with diminished range of motion. (*Id.*) All her neurological exams were normal, but an MRI of her cervical spine from May 31, 2005, showed significant cervical disease. (*Id.*) The record indicated that she was not seen for neck pain in 2006 or for most of 2007. (Tr. at 52-53.) She alleged no pain on June 26, 2007, when seen at Parkland for a medication refill. (Tr. at 53.) She had just mild neck pain on November 7, 2007, and was diagnosed with a neck sprain and given Hydrocodone. (*Id.*) On December 5, 2007, she was seen at Parkland for neck pain but not given any more narcotics. (*Id.*)

The ME testified that Plaintiff had a diminished grip in her right hand on September 25, 2005, and had diminished strength in her right arm on November 20, 2007. (Tr. at 52.) She had some shoulder pain on April 21, 2008, but was noted as ambulating easily. (Tr. at 53.) Her exams for chronic pain in September and October of 2008, were normal and she was felt to be "under the influence of something." (*Id.*) She tested positive for marijuana on three occasions between 2006 and 2008. (*Id.*) She was last seen on April 30, 2009, for complaints of tearing a muscle in her right shoulder, but apart from some diminished range of motion, her physical exam and x-rays were normal. (*Id.*) Her treating source noted that she was counseled due to previous drug-seeking behavior and marijuana abuse and was not given a refill of Hydrocodone. (Tr. at 53-54.)

Upon examination by the ALJ, the ME testified that Plaintiff's impairments singly or in combination did not meet or equal a listing. (Tr. at 54.) As to her functional limitations, he testified that her significant cervical disease, and some knee disorder which may or may not be severe, limited her to lifting ten pounds occasionally and less than ten pounds frequently. (*Id.*) She could

stand two to four hours in an eight-hour workday, sit for six or more hours with a stand and stretch option every thirty to forty-five minutes for a few minutes, and could not work with ropes, ladders or scaffolding. (Tr. at 54-55.) Because of her cervical disease, she could not reach overhead, lift overhead, or perform overhead work, but her reaching was unlimited otherwise. (Tr. at 55.) She had occasional postural limitations but could not kneel, crawl, balance, or work around hazards. (*Id.*) There was no objective evidence to support manipulative limitations such as handling and fingering, and there was nothing related to psychological impairments in the medical record. (*Id.*)

### iii. Vocational Expert's Testimony

The VE classified Plaintiff's past relevant work as a home attendant, cashier checker, cashier, day worker, waitress, and merchant patroller. (Tr. at 56.) The ALJ asked the VE whether Plaintiff could perform work with the following function limitations: lift ten pounds maximum; stand two to four hours in an eight hour workday; sit "hours[3] of an eight hour workday" with an opportunity to change positions for two minutes at thirty to forty-five minute intervals; no ropes, ladders or scaffolds; no crawling, kneeling, or balancing; occasional posturals; no overhead work bilaterally including reaching and lifting; no work in contact with vibrating machinery; no work at heights; and no work in close proximity to hazardous machinery. (Tr. at 56-57.) The VE classified the functional limitations as sedentary, and responded that Plaintiff could perform her past relevant work as a merchant patroller, and a cashier if it involved a night job at some convenience store, and could also perform other jobs existing in significant numbers in the economy. (Tr. at 56-58.)

Upon cross-examination by Plaintiff's attorney, the VE testified that even if Plaintiff's reach with her right dominant hand was limited to occasional, she could perform the work identified in the

---

[3] The hearing transcript does not reflect the number of hours, if any, specified by the ALJ.

national economy, but all competitive employment would be precluded if Plaintiff had to take unscheduled breaks due to pain or had to lie down at an unscheduled time. (Tr. at 61.)

C.      **ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on July 9, 2009. (Tr. at 9-18.) He found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 13, ¶2.) He also found that Plaintiff suffered from the severe impairments of "thyroid problem, HTN, lumbar problem, left knee, and neck," but concluded that these impairments did not meet or medically equal a listed impairment. (Tr. at 13, ¶¶ 3, 4.) He found that Plaintiff had the RFC to perform a restricted range of light work limited by: lifting and carrying ten pounds maximum; standing two to four hours and sitting six hours in an eight-hour work day, with necessity for change of position to stretch for two minutes at thirty to forty-five minute intervals; no overhead work bilaterally reaching or lifting; no climbing of ropes, ladders, and scaffolds; no balancing, crawling, or kneeling; occasional bending and stooping; no work at heights; no work with or in close proximity to hazardous equipment; and no contact with vibrating machinery. (Tr. at 14, ¶ 5.) He also found that Plaintiff was unable to perform her past relevant work, but could perform other jobs existing in significant numbers in the economy. (Tr. at 17-18, ¶¶ 6-10.) He concluded that Plaintiff had not been disabled since the alleged onset date through the date of his decision. (Tr. at 19, ¶ 11.)

## II. ANALYSIS

A.      **Legal Standards**

   1.      **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.*

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). The Commissioner utilizes a sequential five-step inquiry to determine whether an adult is disabled and entitled to benefits under the Social Security Act:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other

similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3. Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse the Commissioner's decision and award benefits, and in the alternative, to remand for further proceedings. (Pl. Br. at 15.)

When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, *10 (N.D. Tex. Sept. 22, 2009) (adopting recommendation of Mag. J.). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id.* at *11 (citation omitted). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005). The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

## B. Issue for Review

Plaintiff argues that the disability determination was not supported by substantial evidence and was not made pursuant to a proper standard because the ALJ:

1. did not apply a *de minimis* standard at step two of the sequential evaluation process;

2. did not include any rationale supporting the conclusory statement that Plaintiff did not suffer from a listed impairment;

3. improperly discounted Plaintiff's subjective allegations of disabling pain;

4. did not address Plaintiff's work history in making a disability determination; and

5. did not address whether Plaintiff could maintain employment.

(Pl. Br. at 1.)

C. **De Minimis Standard**

Plaintiff first argues that the ALJ did not apply the required *de minimi*standard of severity set out in *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985), at step two of the sequential evaluation process, and failed to include right shoulder, arm and hand problems, and thoracic back problems as severe impairments. (Pl. Br. at 8-9.)

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that a literal application of these regulations would be inconsistent with the Social Security Act because they include fewer conditions than indicated by the statute. *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985). Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Id*. at 1101. Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." *Id*. at 1104.

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used." *Id*. at 1106; *accord Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Eisenbach v. Apfel*, 2001 WL 1041806, at *6 (N.D. Tex. Aug. 29, 2001) (Boyle,

Mag.). Notwithstanding this presumption, the Court must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986). Unless the correct standard of severity is used, the claim must be remanded to the Commissioner for reconsideration. *Stone*, 752 F.2d at 1106.

Here, the ALJ cited *Stone* at step two, but stated elsewhere in his decision that an "impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." (*See* Tr. at 12-13.) This is the standard set forth in 20 C.F.R. §§ 404.1520(c) and 416.920(c) and one that *Stone* found to be inconsistent with the Social Security Act. *See* 752 F.2d at 1104-05. The ALJ also stated that "an impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." (Tr. at 12.) Under *Stone*, however, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." 752 F.2d at 1101. Unlike the standard set out by the ALJ, *Stone* provides no allowance for a minimal interference with a claimant's ability to work.

Although the ALJ referenced *Stone* in his decision, the Court must look beyond these "magic words" to determine whether he applied the Fifth Circuit's construction of a severe impairment. *Hampton*, 785 F.2d at 1311. The express recitation of a standard inconsistent with the *Stone* standard, and the absence of a narrative discussion at step two, creates an ambiguity as to the whether the correct standard of severity was applied. *See Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3 (N.D. Tex. Jan. 26, 2010) (citing *Neal v. Comm'r. of Soc. Sec. Admin.*, No.

3-09-CV-0522-N, 2009 WL 3856662, at *1 (N.D. Tex. Nov. 16. 2009)). Such ambiguity must be resolved at the administrative level, *Neal*, 2009 WL 3856662, at *1, and precludes an immediate award of benefits. *See Wells*, 127 F. App'x at 718.

Generally, appeals from administrative agencies of a procedural error will not lead to a vacated judgment "unless the substantial rights of a party have been affected." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (citing *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam)). However, the ALJ's failure to apply the *Stone* standard is a legal error, not a procedural error. The Fifth Circuit left the lower courts no discretion to determine whether such an error is harmless. Rather, the court mandated that "[u]nless the correct standard is used, the claim *must* be remanded to the Secretary for reconsideration." *Stone*, 752 F.2d at 1106 (emphasis added). Because the ALJ applied an incorrect standard of severity at step two, remand is required. Since remand is required for a step two error, the Court does not consider the remaining issues for review.

### III. CONCLUSION

*Plaintiff's Motion for Summary Judgment* is **GRANTED**, *Defendant's Motion for Summary Judgment* is **DENIED**, and the case is **REMANDED** to the Commissioner for reconsideration.

**SO ORDERED, on this 17th day of August, 2010.**

**IRMA CARRILLO RAMIREZ**
**UNITED STATES MAGISTRATE JUDGE**